THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| JOELLE TANNER,<br><br>Plaintiff,<br><br>v.<br><br>OFFICER NOLAN JENKINS, LEHI CITY, and JOHN DOES 1–5,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [49] DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 2:22-cv-00474-DBB-JCB<br><br>District Judge David Barlow |

Before the court is Defendants Officer Nolan Jenkins' and Lehi City's Motion to Dismiss.[1] After the court dismissed Plaintiff Joelle Tanner's claims without prejudice on March 2, 2023,[2] she filed her Amended Complaint.[3] The Amended Complaint asserts claims under 42 U.S.C. § 1983 that her constitutional rights were violated when she was arrested, detained, and prosecuted for domestic violence.[4] The Defendants assert that the arresting officer is entitled to qualified immunity and that Lehi City is not liable. For the reasons below, the court grants Defendants' motion.

## BACKGROUND[5]

This case centers on a Lehi City police officer's decision to arrest Plaintiff Joelle Tanner for domestic violence. Joelle and Justin Tanner were married in 2020.[6] During the Tanners' first

---

[1] Am. Mot. to Dismiss, ECF No. 49, filed September 15, 2023 [hereinafter MTD].
[2] Minute Entry, ECF No. 38, entered March 2, 2023.
[3] Am. Compl., ECF No. 40, filed April 3, 2023.
[4] Am. Compl. 12–16.
[5] Because the court is reviewing the facts on a motion to dismiss, the following factual allegations taken from Ms. Tanner's Amended Complaint are treated as true.
[6] Am. Compl. ¶ 12.

year of marriage, Lehi City Police were called at least three times on allegations of domestic

violence.[7] On August 10, 2020, Ms. Tanner notified Lehi police that Mr. Tanner choked her and

repeatedly threw her on the ground.[8] Upon being questioned, Mr. Tanner admitted the

allegations.[9] Ms. Tanner was transported from her home to the local hospital where she was

diagnosed with a fractured pelvis.[10] Lehi Officer Marten Thomas accompanied Ms. Tanner to the

hospital in the ambulance.[11] Officer Thomas made Ms. Tanner feel uncomfortable when he

rubbed his hands on hers and turned off his body camera when no nurses were present.[12]

Following being discharged from the hospital, Officer Thomas "visited [Ms. Tanner] at her home

socially" on two separate occasions.[13] Ms. Tanner called the Lehi City Police Department soon

after and asked that Officer Thomas stop visiting her at her home.[14] The Police Chief was very

defensive of Officer Thomas.[15] Officer Thomas visited Ms. Tanner one additional time after she

complained.[16]

  Mr. Tanner moved back in with Ms. Tanner in November 2020.[17] Ms. Tanner declined to

testify against Mr. Tanner and his charges were dismissed.[18] On December 28, 2020, the officer

at issue in this case, Officer Jenkins, and two other officers responded to another incident at the

Tanner residence.[19] Common practice and protocol is that when responding to domestic violence

---

[7] Am. Compl. ¶¶ 13–14, 43.
[8] *Id.* ¶¶ 16–17.
[9] *Id.* ¶ 18.
[10] *Id.* ¶ 24.
[11] *Id.* ¶ 24.
[12] *Id.* ¶ 26–27.
[13] *Id.* ¶ 28.
[14] *Id.* ¶ 31.
[15] *Id.* ¶ 32.
[16] *Id.* ¶ 34.
[17] *Id.* ¶ 20.
[18] *Id.* ¶ 38–39.
[19] *Id.* ¶ 43.

situations, police officers review materials from prior visits to the same residence.[20] Officer

Jenkins knew of Mr. Tanner's prior conduct.[21] When the officers arrived on the scene, both Mr.

Tanner and Ms. Tanner were uncooperative and no action was taken.[22]

On February 18, 2021, Lehi City Police were called again to respond to a domestic

violence situation.[23] Unlike the prior incident, Officer Jenkins was not present. Mr. Tanner

claimed that the couple was only having a verbal disagreement and no physical abuse occurred.[24]

Ms. Tanner told the officers that he had been physically aggressive and had punched a hole in the

wall.[25] She also told the officers that she feared that Mr. Tanner would become violent that night

or the next day and asked that they take action.[26] No action was taken.[27]

The next day, on February 19, 2021, Lehi City Police were called again to the Tanner

residence. Ms. Tanner asked her daughter to call 911 because she feared things were escalating

into physical violence.[28] Ms. Tanner then called 911 shortly thereafter to report that Mr. Tanner

had punched her in her side.[29] Dispatch advised Officer Jenkins and another officer that was on

the scene the night prior that there likely was physical violence and that firearms were reportedly

involved.[30]

Upon arriving, Officer Jenkins talked to Mr. Tanner, who claimed that he was the victim.

Mr. Tanner claimed that Ms. Tanner hit Mr. Tanner in the back and tried to push him down the

---

[20] Am. Compl. ¶ 45.
[21] *Id.* ¶ 46–47.
[22] *Id.* ¶ 51.
[23] *Id.* ¶ 52.
[24] *Id.* ¶ 56.
[25] *Id.* ¶ 57.
[26] *Id.* ¶ 59.
[27] *Id.* ¶ 60.
[28] *Id.* ¶ 62.
[29] *Id.* ¶ 63.
[30] *Id.* ¶ 66.

stairs in the presence of her daughter.[31] Officer Jenkins observed Mr. Tanner's back and did not

see any marks.[32] Officer Jenkins then talked to Ms. Tanner, who stated that Mr. Tanner was no

longer taking his medication for depression, anxiety, and ADD and was acting "crazy."[33] Ms.

Tanner claimed that the facts were the reverse of Mr. Tanner's version: he hit her in the back and

tried to push her down the stairs.[34] Ms. Tanner's daughter stated that Mr. Tanner "looked like he

was about to push [Ms. Tanner] down the stairs"[35] but "he didn't look like he was going to

though."[36] Ms. Tanner told Officer Jenkins that Mr. Tanner succeeded in throwing her down on a

pile of guns.[37] Officer Jenkins asked her whether she had any bruises on her, but did not check

her for any marks.[38]

Officer Jenkins then asked Mr. Tanner whether he punched Ms. Tanner in the back.[39] Mr.

Tanner responded that he "never in a million years" would hit her.[40] Officer Jenkins reviewed a

"audio recording of the night" Mr. Tanner had made. The Amended Complaint describes the

audio as showing that Ms. Turner was allegedly "verbally aggressive."[41] On the basis of the

audio, Officer Jenkins arrested Ms. Tanner for Domestic Violence Assault, a class B

misdemeanor, and Felony Domestic Violence in the Presence of a Child.[42]

---

[31] Am. Compl. ¶ 75.
[32] *Id.* ¶ 76.
[33] *Id.* ¶ 79.
[34] *Id.* ¶ 80.
[35] *Id.* ¶ 80.
[36] Personal Information and Statement of Fact Form referenced at Am. Compl. ¶ 71.
[37] Am. Compl. ¶ 81.
[38] *Id.* ¶¶ 83, 85.
[39] *Id.* ¶ 87.
[40] *Id.* ¶ 88.
[41] *Id.* ¶ 90.
[42] *Id.* ¶¶ 89-90.

Ms. Tanner asked Officer Jenkins if he would ensure that her daughters would be safe with Mr. Tanner given that he was not taking his medication and had access to several guns.[43] He declined.[44] Ms. Tanner further alleges that another officer on the scene, Officer Rudolph, was surprised by Officer Jenkins' decision to arrest Ms. Tanner and a heated conversation regarding the matter occurred.[45] Officer Rudolph took Ms. Tanner to the hospital for evaluation and imaging "came back clean for fractures or internal abnormalities."[46] The Amended Complaint does not allege that any bruises or other injuries were discovered.

Ms. Tanner spent hours in jail and had to post bail to be released.[47] The felony charge delayed and complicated her ability to obtain a protective order against Mr. Tanner.[48] Further, the criminal charges precluded Ms. Tanner from returning to her home after posting bond, forcing her to rent an apartment.[49] Lehi City Police regularly stationed patrol vehicles outside of Ms. Tanner's apartment for nine months following her arrest.[50] Lehi City Police refused to assist Ms. Tanner in recovering her belongings or in enforcing a later obtained protective order.[51]

Lehi City brought misdemeanor domestic violence charges against Ms. Tanner, but not a felony charge.[52] It ultimately dismissed the charges.[53] On May 20, 2022, Ms. Tanner filed her case in Utah state court.[54] Defendants removed the action to federal court shortly thereafter and

---

[43] Am. Compl. ¶ 92.
[44] Id. ¶ 93.
[45] Id. ¶¶ 99–100.
[46] Id. ¶ 101.
[47] Id. ¶ 108.
[48] Id. ¶ 109.
[49] Id. ¶ 113.
[50] Id. ¶ 116.
[51] Id. ¶¶ 114-115.
[52] Id. ¶¶ 118, 120.
[53] Id. ¶ 121.
[54] Notice of Removal ¶ 1, ECF No. 2, filed July 19, 2022.

later filed a motion to dismiss.[55] The court held a hearing on Defendants' First Motion to Dismiss, which it granted.[56]

Ms. Tanner then filed the subject Amended Complaint. It contains many new allegations and asserts a (1) First Amendment retaliation claim, (2) a Fourth Amendment false arrest and unlawful detention claim, (3) and a Fourteenth Amendment malicious prosecution and abuse of process claim under 42 U.S.C. § 1983 against Lehi City and Officer Jenkins.[57] Defendants again moved to dismiss.[58]

## STANDARD

"[F]or the purposes of resolving a Rule 12(b)(6) motion, [the court accepts] as true all well-pleaded factual allegations in a complaint and view[s] these allegations in the light most favorable to the plaintiff."[59] "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[60] Thus, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[61] A claim 'has facial plausibility' if the plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"[62] A plaintiff must allege sufficient facts to

---

[55] Notice of Removal ¶ 2.

[56] Minute Entry, ECF No. 28, entered March 2, 2023.

[57] Am. Compl. ¶¶ 63–83.

[58] Motion to Dismiss, ECF No. 49, filed September 15, 2023 [hereinafter MTD].

[59] *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)).

[60] *Sutton v. Utah State Sch. For Deaf & Blind*, 173, F.3d 1226, 1236 (10th Cir. 1999).

[61] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[62] *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1158–59 (10th Cir. 2021) (citing *Iqbal*, 556 U.S. at 678).

'nudge[] [her] claims . . . across the finish line from conceivable to plausible.'"[63] "The

plausibility standard is not akin to a 'probability requirement,' but it askes for more than a sheer

possibility that a defendant has acted unlawfully."[64]

## DISCUSSION

### I.      Qualified Immunity

Officer Jenkins raises a qualified immunity defense. "The qualified-immunity doctrine

protects public employees from both liability and 'from the burdens of litigation' arising from

the exercise of discretion."[65] When a defendant raises the qualified-immunity defense, "the onus

is on the plaintiff to demonstrate '(1) that the official violated statutory or constitutional rights,

and (2) that the right was "clearly established" at the time of the challenged conduct.'"[66] If a

plaintiff fails to establish either prong of the standard, the defendant prevails.[67] The court elects

to consider the "clearly established" prong.

### A.      Clearly Established Law

Ms. Tanner must show that as of February 19, 2021, the law was clearly established that

Officer Jenkins' alleged actions violated her clearly established rights.[68] This is because "the

doctrine of qualified immunity shields officers from civil liability so long as their conduct 'does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.'"[69] Thus, "[i]t is not enough that a rule be suggested by then-existing

---

[63] *Id.* (citing *Iqbal*, 556 U.S. at 680).
[64] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).
[65] *Cummings v. Dean*, 913 F.3d 1227, 1239 (10th Cir. 2019) (quoting *Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013)).
[66] *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).
[67] *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016).
[68] *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).
[69] *City of Tahlequah v. Bond*, 595 U.S. 5, 12 (2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

precedent, the 'contours of the law must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[70] It is only government officials who are "plainly incompetent or . . . who knowingly violate the law" that are not shielded.[71] "Existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'"[72]

At the outset, Plaintiff's general assertion that binding authority has clearly established "the right to be free from false arrest, unlawful detention, malicious prosecution and retaliation" is insufficient.[73] "[C]ourts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question of whether the official acted reasonably in the particular circumstances that he or she faced.'"[74] Rather, courts must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment."[75]

Ms. Tanner argues that three cases clearly established that Officer Jenkins' conduct was unlawful. First, she cites to *Baptiste v. J.C. Penney Co.*[76] *Baptiste* held that "clearly established case law requires an officer to look at the 'totality of the circumstances'" when evaluating whether an officer has "sufficient reasonably trustworthy information to constitute probable

---

[70] *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

[71] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

[72] *Wesby*, 538 U.S. at 63 (quoting *Ashcroft v. al-Kidd* 563 U.S. 731, 741 (2011)).

[73] Opp. 15. Plaintiff string cites, with no discussion, three cases. Plaintiff does not address how the cases apply, and the cases are inapposite. *See Dodds v. Richardson*, 614 F.3d 1185, 1206 (10th Cir. 2010) (preventing arrestees from posting preset bail violates the Constitution); *Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 2008) (coercing fabricated confessions is unlawful); *DeLoach v. Bevers*, 922 F.3d 618, 620-21 (10th Cir. 1990) (concealing exculpatory evidence as "payback . . . for hiring smart-ass lawyer" violates the Constitution).

[74] *Wesby* at 63–64. (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

[75] *White v. Pauly*, 580 U.S. 73, 79 (2017); *see Wesby*, 538 U.S. at 65 (stressing the importance of identifying a case involving an officer in similar circumstances because "it difficult to know how the general standard of probable cause applies in the precise situation encountered.").

[76] *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998).

cause."[77] In evaluating the totality of the circumstances, "officers may weigh the credibility of witnesses in making a probable cause determination, [but] they may not ignore *available and undisputed* facts."[78] The failure to investigate "easily accessible evidence" impermissibly delegates an officer's duty to investigate. The Tenth Circuit found that the officers in *Baptiste* were not entitled to qualified immunity when they reviewed video evidence exonerating an alleged shoplifter but arrested the alleged shoplifter anyway.[79]

This case is not like *Baptiste*. Here, Officer Jenkins did not have "available and undisputed" facts that would have exonerated Ms. Tanner.[80] Nothing in the Amended Complaint alleges that Officer Jenkins failed to investigate something akin to an easily accessible video recording that showed Ms. Tanner not committing the very crime that gave rise to her arrest. To the contrary, the Amended Complaint alleges that Officer Jenkins reviewed an audio recording, and that audio recording showed Ms. Tanner was "verbally aggressive" and provided at least some support for believing that Ms. Tanner may have attempted to push Mr. Tanner down some stairs on the night she was arrested. Assuming, as the Amended Complaint alleges, that Officer Jenkins also was aware of but failed to properly weigh Mr. Tanner's earlier domestic violence or officers' prior visits to the Tanner residence, such evidence goes to the Tanners' relative credibility, but is not the kind of undisputed evidence in *Baptiste*.

Ms. Tanner next discusses *Cortez v. McCauley*.[81] But *Cortez* is nothing like this case. There, the Tenth Circuit found that the "law was clearly established that the double-hearsay statement of a nurse, based on information allegedly provided by a two-year-old child and

---

[77] *Id.* at 1259.
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] 478 F.3d 1108 (10th Cir. 2007).

reported in a telephone call, does not establish probable cause and that more information is necessary."[82] Other than the double-hearsay statement of a two-year old, officers had no other information suggesting a crime had been committed, and they "conducted no investigation."[83] Here, Officer Jenkins interviewed all three witnesses and reviewed an audio recording. *Cortez* would not have put Officer Jenkins on notice that his conduct was unlawful.

The final case Ms. Tanner cites is *Hartman v. Moore*,[84] albeit in a single sentence. *Hartman* found that "the law is settled *that as a general matter* the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out."[85] But the Supreme Court did not grant certiorari to address qualified immunity.[86] Rather, *Hartman* resolved the question of whether the absence of probable cause was an element of a retaliatory-prosecution action, finding that it was.[87] The Court simply did not address the issue of qualified immunity and its "holding does not go beyond a definition of an element of the tort."[88]

Finally, Ms. Tanner also includes a string cite to four cases for the proposition that the "law is clearly established that false statements in a Probable Cause statement violate the Fourth Amendment."[89] Two of the cases cited are district court cases which are not capable of meeting

---

[82] *Cortez v. McCauley*, 478 F.3d 1108, 1118 (10th Cir. 2007).
[83] *Id*.
[84] *Hartman v. Moore*, 547 U.S. 250 (2006).
[85] *Id*. at 256 (citing *Crawford-El v. Britton*, 253 U.S. 574, 588 n.10 (1998)).
[86] *Id*. ("We granted certiorari . . . to resolve the Circuit split" regarding "the issue of requiring evidence of a lack of probable cause in 42 U.S.C. § 1983 . . . retaliatory-prosecutions suits.").
[87] *Id*. at 256–57.
[88] *Id*. at 257 n.5.
[89] Opp'n 7.

the "clearly established" standard. The other two are not factually similar to the situation here.[90] Neither the facts nor the cases themselves are discussed by Plaintiff and compared to this case.

In short, Ms. Tanner has identified no factually apposite cases making it "'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[91] The effort to overcome Officer Jenkins' qualified immunity fails.

### B.   *Monell* Liability

Municipalities may be liable in a § 1983 action only where their policies are the "moving force" behind the alleged constitutional violation.[92] "To establish municipal liability, a plaintiff must show (1) the existence of a municipal policy or custom, and (2) that there is a direct causal link between the policy or custom and the injury alleged."[93] A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the

---

[90] *See Taylor v. Meacham*, 82 F.3d 1556 (10th Cir. 1996) (false statements of fact in arrest warrant affidavit); *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004) (falsification of evidence unlawful). The same is true on the retaliation claim, where Plaintiff cites one Tenth Circuit case in passing. *Northington v. McGoff*, 968 F.2d 20 (10th Cir. 1992).
[91] *City of Tahlequah*, 595 U.S. at 11 (quoting Wesby, 583 U.S. at __).
[92] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978).
[93] *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993).

"failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."[94]

The Amended Complaint summarily alleges that Lehi City has failed to train its officers sufficiently on domestic violence and probable cause, has a practice of arresting and charging domestic violence victims to discourage 911 calls, and offers undefined "sweetheart" deals to criminal defendants to protect the City and its officers from civil liability. These conclusory allegations, unsupported by facts making them plausible, are insufficient to state a cognizable claim under *Monell*. Plaintiff spends only a few sentences in her Opposition arguing otherwise, in which she cites two single sentences from her Amended Complaint.[95] No effort is made to engage with the case law or to show how a plausible claim has been stated.[96] Instead, Plaintiff primarily argues that she should be allowed to amend her Complaint to address any deficiencies.[97] Accordingly, the Amended Complaint fails to state a plausible *Monell* claim against Lehi City.

## ORDER

Defendants motion to dismiss is GRANTED and the Amended Complaint is DISMISSED without prejudice.

---

[94] *Brammer–Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) and *City of Canton v. Harris*, 489 U.S. 378, 388–91, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)) (internal quotation marks omitted).
[95] Am. Compl. ¶¶ 98-99.
[96] Opp'n 17.
[97] *Id.* at 18.

Signed June 17, 2024.

BY THE COURT

David Barlow
United States District Judge